**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILLARD ASSOCIATES, a limited partnership, d/b/a WILLARD INTER-CONTINENTAL HOTEL,  Plaintiff,  v.  BASIC RESEARCH, LLC,  Defendant. | )<br>)<br>)<br>)<br>)<br>)  Civil Case No. 1:06-cv-01171-PLF<br>)<br>)  Judge: Paul L. Friedman<br>)<br>)<br>)<br>) |

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(b)(6)**

COMES NOW Plaintiff[1] in the above captioned action (the "Willard"), by its undersigned counsel, and hereby submits this Opposition to Defendant's Motion to Dismiss Under Rule 12(b)(6). Basic Research's ("BR") Motion to Dismiss Counts I and II of the Willard's Complaint should be denied because (a) contrary to BR's characterization, the Group Reservation Agreement is a binding and enforceable contract, and (b) the facts set forth in the Complaint state a claim for promissory estoppel.

**Factual Background**

This dispute arises from BR's last minute cancellation of 534 room-nights at the Willard hotel and BR's subsequent refusal to pay in accordance with the terms of the parties' contract. The relationship between the Willard and BR began in December of 2005, when a BR representative, Ms. Lynanne Swensen, visited the Willard's sales office at the Hotel on

---

[1] Plaintiff has filed a Motion for Leave to File Amended Complaint that corrects the identity of Plaintiff in this action. The party to the subject transaction is the hotel management company, Inter-Continental Hotels Corp., d/b/a Willard InterContinental Washington DC, rather than the property owner, Willard Associates.

Pennsylvania Avenue (the "Hotel").  (*See* Compl., ¶ 5.) (Decl. of K. Thompson, Exhibit A, ¶ 3).  According to Ms. Swensen, BR needed numerous rooms and suites in downtown D.C. between February 27 and March 30, 2006 because of a Federal Trade Commission hearing involving BR.  (*See* Decl. of K. Thompson, ¶ 3.)  At the Willard, a reservation of this magnitude (over 500 "room-nights," including suites) on such short notice is a difficult request to satisfy.  (*See* Decl. of K. Thompson, ¶ 4.)  After prompt investigation, the Willard decided that it would be able to accommodate BR.  (*See* Decl. of K. Thompson, ¶ 4.)  Thus, the Willard and BR entered into negotiations and, after three weeks of exchanges between Ms. Swensen and Ms. Thompson, the Willard and BR executed the "Group Reservation Agreement."  (*See* Decl. of K. Thompson, ¶ 5.)  Among other things, the Group Reservation Agreement provided that the Willard would hold certain rooms for BR at a set price (including its Washington Suite at a price of $2,500.00 a night), and BR agreed to occupy the rooms or to pay liquidated damages to the Willard if BR cancelled its reservations.  (*See* Agreement, Exhibit B.)

Ultimately, as BR admits, it cancelled all 534 room-nights just two days before it was scheduled to arrive.  (*See* Motion to Dismiss, p. 5.)  The Group Reservation Agreement clearly sets forth the Willard's remedy for BR's cancellation of the reserved rooms:  BR must pay liquidated damages in the amount of $222,591.00, representing 85% of the expected room revenue.  Now, however, BR refuses to pay.

Quite conveniently, BR asserts that the Group Reservation Agreement was not an agreement at all because the Willard had no obligations under the Agreement.  This assertion is not only inconsistent with the language of the Group Reservation Agreement, it is contrary to the behavior of the parties.  The Willard, in fact, held BR's rooms up until the time that BR cancelled.  (*See* Decl. of K. Thompson, Exhibit A, ¶ 8.)  Further, under BR's logic, the Willard

2

had no obligation to hold the rooms, and if BR arrived on the scheduled date, the Willard could have simply given the rooms to someone else. Both the language of the Group Reservation Agreement and the behavior of the parties belies any such interpretation. (*See* K. Thompson Decl., Exhibit A, ¶¶ 8-9.) As is further set forth below, BR's Motion to Dismiss is unfounded and should be denied.

## Legal Standard

A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle it to relief. *Kowal v. MCI Commc'n Corp.,* 16 F.3d 1271, 1276 (D.C. Cir.1994) (*citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The Federal Rules of Civil Procedure require only that the complaint set forth "a short and plain statement of the claim," affording the defendant fair notice of the plaintiff's claim and grounds upon which the claim rests. *Id*. at 47 (*citing Fed. R. Civ. P*. 8(a)(1)). In reviewing a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-plead factual allegations. *In re United Mine Workers of Am. Employee Benefit Plan Litig.*, 854 F.Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979). The court must resolve all factual doubts in favor of the plaintiff and allow the plaintiff the benefit of all proper inferences. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

**Legal Argument**

I. **Count I of the Complaint Survives Because The Group Reservation Agreement Is An Enforceable Contract.**

   A. **The Group Reservation Agreement Is Not Illusory Because It Binds The Willard To Take Action The Willard Otherwise Would Not Have To Take.**

   1. **The Group Reservation Agreement Obligates The Willard To Hold Specific Room types On Specific Dates At Specific Prices.**

The elements of a binding, enforceable contract are familiar: the existence of an agreement, intent to be bound, and consideration. *See Duffy v. Duffy*, 881 A.2d 630 (D.C. 2005). The Group Reservation Agreement satisfies this standard. For example, the Group Reservation Agreement unambiguously sets forth a schedule of the room types, dates, and prices that the Willard contractually committed itself to provide to BR. (*See* Agreement, Exhibit B, pp. 2-3.) Now that BR has reneged on its promise to pay liquidated damages upon its cancellation of the reserved rooms, BR hypothesizes that the Group Reservation is no agreement at all, but rather a "unilaterally drafted bad-faith smoke screen." (Motion to Dismiss, p. 1.) This is news to the Willard, which in fact held the rooms identified in the Group Reservation Agreement up until the time that BR cancelled. (*See* Compl. ¶ 11) (*see* Decl. of K. Thompson, Exhibit A, ¶ 8).

Conversely, it is hardly reasonable to believe that BR understood the Group Reservation Agreement to allow the Willard to raise room prices at its discretion, change room types, or cancel BR's stay without repercussion. Indeed, the only reason that BR afforded the Willard a $90,000 deposit and a rooming list as required by the Group Reservation Agreement is because BR believed (as did the Willard) that the Group Reservation Agreement mutually bound the two parties to its mutually negotiated terms. (*See* Decl. of K. Thompson, ¶ 10.)

4

BR's argument that the Group Reservation Agreement is illusory fails to account for the Willard's obligation to make available the identified rooms on the identified dates at the identified prices. The parties' course of conduct is consistent; BR's argument is not.

### 2. BR Misconstrues The Two Provisions That It Cites To Support Its Claim That The Group Reservation Agreement Does Not Bind The Willard.

Ignoring the Willard's (and BR's) other obligations under the Group Reservation Agreement, BR argues that the following provisions effectively free the Willard from any obligation under the Group Reservation Agreement:

> Should your meeting specifications be requested by another organization prior to your option date, the Willard Inter-Contintental Washington will notify you and provide a forty-eight (48) hour decision period for your organization to confirm this agreement or release the dates requested.
>
> At any time, should another organization request your space, you have the right of first refusal for two (2) business days to sign a contract, or the Hotel has the right to change the status of this booking to a second option.

(Agreement, Exhibit B, p. 6.) BR misreads the point of these two clauses, which is to protect BR in case, *prior to its execution of the Group Reservation Agreement*, another group tries to make similar reservations.

In this instance, the Willard held the rooms out of inventory even before it received BR's signed Group Reservation Agreement. (*See* Decl. of K. Thompson, Exhibit A, ¶ 6.) The quoted clauses state that, even if another group wants to use the space BR has asked to use, the Willard will give BR two days notice to sign a contract—i.e., the Group Reservation Agreement—or BR may lose the space. Once BR signed the Group Reservation Agreement, however, the clauses no longer applied. This makes perfect sense in context of how the hotel industry operates, and is a far cry from simply allowing the Willard to disavow the Group Reservation Agreement at any

5

time for any reason. The cited clauses are internally consistent with the other terms of the Group Reservation Agreement, including the cancellation clause that comes into play only after BR signs the Group Reservation Agreement. (*See* Agreement, Exhibit B, p. 5.)

In support of its argument that the cited clauses render the contract illusory, BR relies solely on the Federal Circuit's decision in *Ridge Runner Forestry v. Veneman*, 287 F.3d 1058 (Fed. Cir. 2002). The *Ridge Runner* analysis, however, actually supports a finding that the Group Reservation Agreement is legally binding and enforceable.

In *Ridge Runner*, the Forestry Service issued a Request for Quotation (RFQ) for fire protection services, and Ridge Runner submitted a proposal, signing a tender agreement which incorporated the RFQ. The RFQ, however, simply stated that if, at some point in the future, the Forestry Service needed the services of Ridge Runner, then Ridge Runner would provide those services "*to the extent contractor is willing and able at the time of the order.*" *Ridge Runner*, 287 F.3d at 1060 (emphasis in decision). The RFQ further allowed the Forestry Service to hire any other company it desired for the services. *Id.* at 1061. After the Forestry Service failed to call upon Ridge Runner's services for "several years," Ridge Runner brought suit under the Contract Disputes Act (CDA), 41 U.S.C. § 601-613. *Id.* On appeal, the Federal Circuit held that the Department of Agriculture lacked jurisdiction under the CDA because the exchange between the parties was not a contract. *Id.* According to the Federal Circuit, the Tender Agreement did not purport to put any limitation on the freedom of either the Forestry Service (it could use anyone) or Ridge Runner (it could, without repercussion, decline to provide its services).

The facts before this court, however, are exactly the opposite: the Willard agreed to provide BR with specific room types at specific rates on specific dates, and BR agreed to pay for

6

the rooms in full if used, and to pay liquidated damages in the event that it cancelled the rooms. The Group Reservation Agreement is mutually binding and is enforceable.

### B. The Group Reservation Agreement Unambiguously Requires BR To Pay Liquidated Damages If It Cancels Its Reservations After Signing The Contract.

BR concedes that it cancelled its reservations on February 24, 2006.  (Motion to Dismiss, p. 5.)  According to BR, however, the entire contract is unenforceable because a clause relating to the cancellation of "individual reservations" purportedly conflicts with the clause requiring BR to pay liquidated damages in the event BR cancels after signing the Group Reservation Agreement.  BR's legal logic is flawed, and its reading of the Group Reservation Agreement is wrong as a matter of law.

The Group Reservation Agreement, at page 5, sets forth the following:

> **Cancellation Policy:**
> **Rooms**
>
> In the event of the cancellation of your program after receipt of this signed agreement, the following sliding scale will be assessed as cancellation fee:
>
> | Upon Signature – Arrival | $222,591.00 |
> |---|---|
> |  | 85% of estimated room revenue |
>
> The total liquidated damages are calculated by multiplying the contracted total room nights by the contracted rate(s).

The Group Reservation Agreement also sets forth the following at page 4 to address the cancellation of individual room-nights:

7

| **Billing Procedures:** | |
|---|---|
| Cancellation: | Individual reservations must be cancelled by 6:00 pm the day prior to arrival to avoid a no show charge |

According to BR, the Group Reservation Agreement is meaningless because, under the "individual reservations" clause, BR could have avoided any cancellation damages at all simply by having its Group guests cancel their rooms, night after night, until the 534 room-nights expired. This interpretation is incorrect because the Group Reservation Agreement accounts for this very problem by the total-room "Attrition" limitation at page 5 of the Group Reservation Agreement. This provision states:

**ATTRITION**

The following is a schedule of fees in the event that your cumulative room pick up does not attain contracted numbers (this is a one-time fee):

| $222,591.00 (85% or more of estimated room revenue) | None |
|---|---|
| $222,591.00 (84% or less of estimated room revenue) | All rooms that are not picked up will be charged 100% at the group rate. |

In other words, the Willard agreed to let BR cancel some of its rooms on an individual basis after executing the Group Reservation Agreement, thereby reducing the total amount payable. Nevertheless, BR agreed that it would pay the Willard no less than 85% of the expected room revenue even if these individual cancellations caused the cumulative room pick up to fall below the identified threshold. Thus, there is no conflict between the language under the Billing

8

Procedures heading and the language under the Cancellation heading when viewed in light of the limit on the room-night Attrition clause.

In support of its contention that this Court should refuse to enforce the Group Reservation Agreement altogether, BR relies exclusively on the case of *Duffy v. Duffy*, 881 A.2d 630 (D.C. 2005) in which the Court of Appeals for D.C. actually enforced the subject contract because it was not ambiguous. *Duffy* involved a letter agreement concerning the divorce of a couple. The letter agreement purported to identify the "basic terms" and "key items" agreed upon between the parties. *Duffy*, 881 A.2d at 635. The court held that the letter agreement in fact set forth several agreed-upon items such as child custody visitation rights, and child support. *Id.* at 635. The court further held that the parties "intended to be bound" to the letter agreement, as evidenced by their mutual signatures on the letter. *Id.* at 636-637. Moreover, the court added, the parties in fact abided by the terms of the letter agreement over the course of a year. *Id.* at 637. Thus, the letter agreement constituted an enforceable contract under D.C. law.

Here, as in *Duffy*, the Group Reservation Agreement identifies the key terms (the number of rooms, dates, rates, and cancellation damages, to name a few) and contains the signature of both parties. Further, both the Willard and BR behaved as if the Group Reservation Agreement governed their relationship until BR refused to pay liquidated damages under the Cancellation clause. In short, the Group Reservation Agreement is enforceable, and it is not ambiguous.

    **C.**    **Even If The Court Finds That The Group Reservation Agreement Is Ambiguous, Which It Is Not, The Court Still Should Deny BR's Motion To Dismiss.**

The Motion to Dismiss should be denied even if this Court finds that the language in the Group Reservation Agreement is ambiguous as to a material term. First, the existence of a contract is a question of fact for the jury not fit for preliminary determination under Federal Rule of Civil Procedure 12(b)(6). *See Disability Rights Council of Greater Washington v. Washington*

9

*Metropolitan Area Transit Authority,* 234 F.R.D 1,2 (D.D.C. 2006) (observing that "the existence of a contract and the language contained therein is a factual matter."); *see also Schwartz v. Paralyzed Veterans of America,* 930 F.Supp. 3, 7 (D.D.C. 1996) (noting that "the question of whether a contract exists is one for the jury."). In this case, discovery will show that the parties entered into an agreement that set forth the essential terms of the respective promises, that the parties intended to be bound to that agreement, and that each gave good and valuable consideration for those respective promises.

Second, the Group Reservation Agreement contains a clause stating that, "If any provision of the contract is unenforceable under applicable law, the remaining provisions shall continue in full force and effect." (Agreement, Exhibit B, p. 6.) Thus, this Court should not rule that the entire Group Reservation Agreement is unenforceable on the basis of the allegedly ambiguous provisions. The Motion to Dismiss should be denied.

## II. Count II of the Complaint Survives Because the Willard Has Alleged Facts Supporting A Claim Of Promissory Estoppel.

### A. The Willard's Complaint States A Claim For Promissory Estoppel.

In order to establish a promissory estoppel claim under District of Columbia law, the plaintiff must show 1) that a promise was made; 2) that the plaintiff reasonably relied on that promise, and 3) that the plaintiff detrimentally relied on the promise. *Simard v. Resolution Trust Corp.*, 639 A.2d 540, 552(D.C. 1994) (citing *Choate v. TRW, Inc.*, 14 F.3d 74, 77 (D.C. Cir. 1994)). BR's Motion to Dismiss Count II should be denied because the Willard's Complaint alleges facts that establish each element of promissory estoppel.

First, the Complaint alleges that a representative of BR made a promise to the Willard. (Compl., ¶¶ 8-10.) In late December 2005 and January 2006, a BR representative contacted the Willard and promised to pay the Willard a deposit of $90,000 and a total of $261,872 in

10

exchange for the Willard reserving 534 room-nights for BR at the Hotel.  (*See* Compl., ¶ 8.)  The BR representative further promised to pay the cancellation fee of $222,591.00 in the event BR was unable to utilize the rooms.  (Compl., ¶ 9).

Second, the Willard reasonably relied on this promise by BR since (1) BR negotiated with the Willard to secure 534 rooms of a specific type, for specific dates and at specific prices, (2) BR informed the Willard that the rooms were to accommodate BR due to a Federal Trade Commission hearing which necessitated BR's presence in the D.C. area over a full month and (3) BR provided a deposit in the amount of $90,000 and, later, a rooming list.  (*See* Compl., ¶¶ 8,24) (*See* Decl. of K. Thompson, Exhibit A, ¶¶ 3, 7-9).

Third, the Willard reasonably relied on BR's promise to its own detriment when it reserved a large block of rooms for BR to the exclusion of all other patrons.  (*See* Decl. of K. Thompson, ¶ 8.)  Further, the Willard detrimentally relied on the promise that if BR cancelled the rooms at the last minute it would pay the Willard at least $222,591.00.  (*See* Compl. ¶¶ 26-29.)

### B.   The Federal Rules Allow The Willard To Plead Alternative Theories.

The Willard asserts two causes of action:  Count I for Breach of Contract, and Count II for Promissory Estoppel.  (Compl., ¶¶ 15-20, 21-29.)  Under the Federal Rules of Civil Procedure Rule 8(e)(2), parties may plead in the alternative. (*See* Compl., ¶¶ 21-29.)  In addition to allowing alternative and even hypothetical pleading, a party may state as many separate claims or defenses as the party has regardless of consistency.  *Smith v. The District of Columbia*, 295 F.Supp.2d 53, 54 (D.D.C. 2003) (*citing Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999)).  To the extent the court determines there was not a valid contract between the parties, as BR has wrongly asserted, the Willard Hotel's promissory estoppel count should be upheld and the court should deny the Defendant's Motion to Dismiss Count II under Rule 12(b)(6).

**Conclusion**

For the foregoing reasons, the Willard respectfully requests that this Court deny BR's Motion to Dismiss under Rule 12(b)(6), and proceed to hear the merits of the Willard's claim against BR.

Respectfully submitted,

SEYFARTH SHAW LLP


    s/Z. Taylor Shultz
David A. Blake, Esq. (Bar No. 463940)
Z. Taylor Shultz, Esq. (Bar No. 485879)
SEYFARTH SHAW LLP
815 Connecticut Avenue, NW; Suite 500
Washington, DC  20006-4004
202-463-2400 (telephone)
202-828-5393 (facsimile)

Date:  August 3, 2006                    *Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Opposition To Defendant's Motion To Dismiss Under Rule 12(b)(6) was filed electronically and sent by electronic mail this 3rd day of August, 2006 to:

>Gary F. Bendinger, Esq.
>David A. Greenwood, Esq.
>Howrey LLP
>170 South Main Street, Suite 400
>Salt Lake City, UT  84101

              s/Z. Taylor Shultz
              Z. Taylor Shultz