# EXHIBIT A

Westlaw.

--- F.Supp.2d ----  
--- F.Supp.2d ----, 2006 WL 1731141 (D.D.C.)  
(Cite as: --- F.Supp.2d ----)

Page 1

Briefs and Other Related Documents  
Only the Westlaw citation is currently available.  
United States District Court, District of Columbia.  
KING & KING, CHARTERED, Plaintiff,  
v.  
HARBERT INTERNATIONAL, INC., et al.,  
Defendants.  
Civil Action No. 06-324 (JDB).

June 26, 2006.

**Background:** Law firm, which undertook representation under contingency-fee agreement, filed action against clients in a District of Columbia court, seeking damages for uncompensated or under-compensated legal services that it provided before conduct of its clients lead to a forfeiture of the underlying claim. After removal, clients filed motions to dismiss.

3**Holding:** The District Court, Bates, J., held that absent an allegation that the clients obtained an identifiable benefit as a result of the forfeiture of their claims, the law firm was unable to state a claim for which relief could be granted.

Motions granted.

[1] Contracts 95 ⟺ 27

95 Contracts  
   95I Requisites and Validity  
      95I(B) Parties, Proposals, and Acceptance  
         95k27 k. Implied Agreements. Most Cited Cases  
Under District of Columbia law, an "implied in fact contract" is a true contract containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt.

[2] Contracts 95 ⟺ 337(2)

95 Contracts  
   95VI Actions for Breach

      95k331 Pleading  
         95k337 Breach  
            95k337(2) k. Sufficiency of Allegations to Show Breach. Most Cited Cases  
Under District of Columbia law, to plead breach of contract a plaintiff must allege, an unjustified failure to perform all or any part of what is promised in a contract entitling the injured party to damages.

[3] Attorney and Client 45 ⟺ 150

45 Attorney and Client  
   45IV Compensation  
      45k146 Contingent Fees  
         45k150 k. Effect of Premature Termination or Settlement of Action. Most Cited Cases  
Under District of Columbia law, law firm could not recover expectancy damages under parties' contract where it had undertaken representation pursuant to a contingency-fee agreement but the subsequent conduct of its clients lead to a forfeiture of the underlying claim; prevention doctrine did not apply since clients were entitled to discontinue pursuit of claim.

[4] Contracts 95 ⟺ 303(4)

95 Contracts  
   95V Performance or Breach  
      95k303 Excuses for Nonperformance or Defects  
         95k303(4) k. Performance Prevented by Other Party or Third Person. Most Cited Cases  
District of Columbia's "prevention doctrine," which operates as an exception to the general rule that a party has no duty to perform under a contract containing a condition precedent until the condition occurs, does not apply when the contract, in effect, authorizes prevention; thus, if the contract explicitly or implicitly permits the promisor to take some action, and that action, in turn, prevents or hinders the occurrence of some condition precedent to the promisor's performance obligation, then the failure to meet that obligation will not constitute breach.

[5] Attorney and Client 45 ⟺ 89

45 Attorney and Client  
   45II Retainer and Authority  
      45k87 Commencement and Conduct of Litigation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1731141 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 2

**45k89** k. Bringing or Defending and Dismissal of Action. Most Cited Cases
Under District of Columbia law, the client of an attorney controls his claim and, therefore, is entitled to discontinue pursuit of the claim without penalty.

**[6] Attorney and Client 45 ⚷76(1)**

45 Attorney and Client
   45II Retainer and Authority
      45k76 Termination of Relation
         45k76(1) k. Act of Parties. Most Cited Cases
Implicit in every contractual arrangement between a District of Columbia lawyer and his client is a term permitting the client to discharge the attorney for any reason and at any time.

**[7] Implied and Constructive Contracts 205H ⚷3**

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk3 k. Unjust Enrichment. Most Cited Cases
Under District of Columbia law, a quasi contract is not a contract at all, but a duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment.

**[8] Implied and Constructive Contracts 205H ⚷4**

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk4 k. Restitution. Most Cited Cases
Under District of Columbia law, purpose of restitution is to require a person who has been unjustly enriched at another's expense to compensate the other party for the amount of enrichment, restoring the other to the position he formerly occupied either by the return of something that the other party formerly had or by the transfer of its equivalent in money.

**[9] Attorney and Client 45 ⚷150**

45 Attorney and Client
   45IV Compensation
      45k146 Contingent Fees
         45k150 k. Effect of Premature Termination or Settlement of Action. Most Cited Cases
Under District of Columbia law, law firm could not recover value of legal services rendered under quantum meruit theory where it had undertaken representation pursuant to a contingency-fee agreement but the subsequent conduct of its clients lead to a forfeiture of the underlying claim; a claim for quantum meruit was not sustainable since clients did not obtain any identifiable, tangible benefit as a result of firm's legal services.

**[10] Torts 379 ⚷212**

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)1 In General
            379k212 k. Contracts. Most Cited Cases
To recover under District of Columbia law for intentional interference with contractual relations, the plaintiff must prove four elements: (1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach.

Christopher M. McNulty, Arlington, VA, for Plaintiff.
Michael J. McManus, Jeffrey J. Lopez, Drinker, Biddle & Reath LLP, Laurence Schor, Dennis C. Ehlers, McManus, Schor, Asmar & Darden, L.L.P., Washington, DC, for Defendants.

*MEMORANDUM OPINION*
BATES, District Judge.
*1 This civil action presents an apparently novel question of District of Columbia law: what relief, if any, may a law firm obtain where it undertakes representation pursuant to a contingency-fee agreement but the subsequent conduct of its client leads to a forfeiture of the underlying claim? For the reasons that follow, the Court holds that, absent an allegation that the client obtained an identifiable benefit as a result of the forfeiture, the law firm is unable to state a claim for which relief may be granted. Accordingly, because the plaintiff in this action does not make any such allegation, the Court will dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**BACKGROUND**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----  
--- F.Supp.2d ----, 2006 WL 1731141 (D.D.C.)  
(Cite as: --- F.Supp.2d ----)

Page 3

Plaintiff King & King, Chartered ("King & King"), a District of Columbia law firm, brings this action against its former client, Harbert International, Inc. ("HII"), and several affiliated persons and entities, alleging various theories of recovery, including breach of contract, unjust enrichment, and tortious interference with contract.[FN1] The complaint details a complex web of relationships-both financial and familial-among the defendants, but ultimately the defendants fall into two distinct groups: (1) HII and its president, Raymond Harbert (hereinafter collectively referred to as "the HII defendants"), and (2) HII's former president, Bill Harbert (Raymond's uncle), and two entities that he controls, Liechtenstein-based Bilhar International Establishment ("BIE")[FN2] and Alabama-based Bill Harbert International Construction ("BHIC") (hereinafter collectively referred to as "the BH defendants"). For more than two decades, King & King served as legal counsel to HII with regard to HII's government contracts.2d Am. Compl. ¶¶ 8, 9.[FN3] This action arises out of legal work related to several of those contracts.

Between 1987 and 1989, the United States Army Corps of Engineers awarded fifteen contracts to HII for work to be performed at the Kwajalein Atoll in the Marshall Islands. *Id.* at ¶ 13. After disputes arose between HII and the government over contract performance, in July of 1990, "Bill Harbert, then president of HII[,] authorized engagement of plaintiff to provide legal advice and assistance with respect to the Kwajalein contracts and more particularly to help HII in the preparation and presentation of claims for additional compensation for added costs incurred in contract performance." *Id.* at ¶ 13. From July 1990 through December 2002, King & King provided legal services relating to the Kwajalein claims "on essentially a continuous basis." *Id.* This included submitting "numerous claims for various changes to the work ... at the job site level" as well as "a demand for payment of interest on any amounts found due on said claims." *Id.* at ¶ 14. Most significantly for present purposes, plaintiff prepared a formal claim that sought an adjustment in the price of the Kwajalein contracts, plus interest, in the amount of $12,865,605. *Id.* at ¶¶ 15, 16. That claim-which was signed by Raymond Harbert, as president of HII, and submitted to the government's contracting officer on January 28, 1994-was based on additional costs that HII incurred in its performance on the Kwajalein contracts and that resulted from delays for which HII believed the government was responsible. *Id.* Plaintiff contends that it invested "thousands of hours of work" developing facts relating to the price-adjustment claim. *Id.* at ¶ 16. The government responded to the claim with an allegation that HII had illegally assigned the Kwajalein contracts to BIE. *Id.* at ¶¶ 18-21.[FN4] Eventually, all proceedings relating to the Kwajalein contracts were consolidated before the Armed Services Board of Contract Appeals ("ASBCA"). *Id.* at ¶ 22.

*2 While the ASBCA appeals were ongoing, the government requested that the proceedings be stayed pending resolution of a Department of Justice investigation, which was probing the conduct of HII and BIE in regard to unrelated government contracts. *Id.* at ¶ 23-24. With the consent of HII, the ASBCA suspended the appeals for 150 days on March 17, 1998. *Id.* When the government requested a further stay, the ASBCA issued an order on September 28, 1998, that dismissed HII's appeals without prejudice to reinstatement within three years (that is, on or before September 29, 2001). *Id.* On August 20, 2001-slightly more than a month before the reinstatement deadline-plaintiff wrote to Bill Harbert requesting authorization to proceed with reinstatement of the appeals. *Id.* at ¶ 25. Plaintiff received no response. *Id.* Plaintiff faxed and mailed a further notice to Bill Harbert informing him that the appeals would be forfeited if not timely reinstated and that, unless plaintiff received written instructions to the contrary, plaintiff would reinstate the appeals. *Id.* Having received no reply from Bill Harbert, plaintiff reinstated the appeals on September 28, 2001. *Id.* In response, the government requested proof of plaintiff's authority to represent HII and specifically its authority to reinstate the appeals. *Id.* at ¶ 26. Plaintiff thereafter requested that Raymond Harbert, as president of HII, confirm that HII was the appellant in the Kwajalein appeals and that plaintiff had been HII's attorney with respect to those claims since they had been filed. *Id.* On March 14, 2002, in response to that request, plaintiff received a letter from Spriggs & Hollingsworth, the law firm that was representing HII in relation to the Justice Department investigation. *Id.* That letter, plaintiff asserts, requested that "future communication with defendant, Raymond Harbert, be sent by plaintiff through the Spriggs firm." *Id.* Subsequently, at the request of Raymond Harbert, plaintiff prepared and filed a motion with the ASBCA to substitute BIE for HII as the appellant in the Kwajalein appeals. *Id.* at ¶ 31.

The ASBCA commenced a three-day evidentiary hearing on the appeals on November 18, 2002. *Id.* at ¶ 32. During the course of that hearing, Raymond Harbert was called as a witness and was asked

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

repeatedly by the administrative judge if he would ratify the reinstatement of the appeals. *Id.* at ¶ 32. The judge explained to Raymond Harbert that ratification was necessary for the case to proceed and for the ASBCA to rule on the motion to substitute BIE for HII as the appellant. *Id.* Raymond Harbert responded that HII's position on ratification was set forth in a November 14, 2002, letter from Spriggs & Hollingsworth to plaintiff, which said that "if it is necessary for HII to ratify the September 28, 2001, reinstatement of the appeals in order for [BIE] to be substituted for HII as appellant, HII is willing to provide such a ratification and hereby does so." *Id.* at ¶ 32. The letter further set forth conditions under which HII would consider remaining as the named appellant. *Id.* On December 20, 2002, the ASBCA issued an order requiring HII to ratify unconditionally the reinstatement of the appeals or otherwise show cause as to why its appeals should not be dismissed with prejudice, and to do so by not later than January 26, 2003. *Id.* Between the conclusion of the November 2002 hearing and the issuance of the December 20, 2002, order, HII indicated in letters, e-mails, and facsimile messages that it might ratify the reinstatement, but HII never responded to the ASBCA's order. *Id.* As a consequence, the ASBCA claims and appeals were dismissed with prejudice on January 26, 2003. *Id.*

*3 Nearly three years later, on January 20, 2006, plaintiff filed this action in the Superior Court of the District of Columbia.[FN5] Pursuant to 28 U.S.C. § 1441, defendants removed the case to this Court. Through this action, plaintiff seeks damages for uncompensated (or under-compensated) legal services that it provided with respect to the Kwajalein claims between February 1995 and December 2002, a period during which plaintiff was performing under a contingency-fee agreement. According to the complaint, as well as the statements made by plaintiff's counsel at the motions hearing, that agreement called for King & King to receive as compensation for its services twenty percent to twenty-five percent of any amount that HII recovered from the government on the claims,[FN6] and beginning in 1997 the agreement further provided that, in addition to the contingency fee, King & King would be paid at a reduced hourly rate of $150. *See id.* at ¶ 34; Tr. of May 24, 2006, Mot. Hr'g. at 58.[FN7] All amounts paid at the hourly rate were to be deducted from the amount due on the contingency fee. *Id.*[FN8] The fee agreement was signed by Bill Harbert on behalf of defendants HII and BHIC (on a date-or dates-that plaintiff has not specified). *Id.*[FN9] Furthermore, by letter dated June 18, 2002, Bill Harbert promised that he personally would honor the commitments he had made on behalf of HII to pay for plaintiff's legal services. *Id.*

Plaintiff now seeks a judgment against defendants "in the amount of $4,779,830.20." *Id.* at ¶ 45.[FN10] Plaintiff says it calculated this amount based on "[t]he total value of the Kwajalein claims/appeals, including interest thereon," which it estimates to be $20,116,762.56. *Id.* at ¶ 34. If that had been the recovery, plaintiff would have been entitled to $400,000 plus twenty-five percent of the amount in excess of $2 million (i.e., $4,529,190.64, or one quarter of $18,116,762.56)-that is, $4,929,190.64, in total. The difference between that amount and the $4,779,830.20 figure that plaintiff demands is $149,360.44, which reflects "deductions for amounts previously paid by defendants to plaintiff for the reduced hourly rates [that] plaintiff billed." *See id.* Simple math thus reveals that plaintiff, based on its own acknowledgments, was paid for about 1,000 hours of work at a rate of $150 per hour. Plaintiff conceded at the motions hearing that it was paid the full hourly rate for all hours worked during the period when the hybrid hourly-contingency contract was in effect (i.e., from 1997 through 2002). Tr. of May 24, 2006, Mot. Hr'g. at 46.[FN11] Defendants filed motions to dismiss asserting that plaintiff has failed to state a claim upon which relief may be granted. *See* Fed.R.Civ.P. 12(b)(6).

**STANDARD OF REVIEW**

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987). All that the rules require of a complaint is that it contain " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting *Conley,* 355 U.S. at 47, 78 S.Ct. 99). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Hishon v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

*4 Under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor. *Leatherman v. Tarrant County Narcotics and Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C.Cir.1979). The plaintiff must be given every favorable inference that may be drawn from the allegations of fact. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C.Cir.2000). Conclusory legal and factual allegations, however, need not be considered by the court. *Domen v. Nat'l Rehabilitation Hosp.*, 925 F.Supp. 830, 837 (D.D.C.1996) (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

## ANALYSIS

### I. Contract and Quasi-contract Claims

Plaintiff, engaging in what is best described as a scattershot approach to pleading, advances numerous theories of recovery arising out of purported contractual or quasi-contractual relationships. *See* 2d Am. Compl. ¶¶ 34-41, 44. At bottom, these claims fit into two broad subcategories, based on the nature of the relief sought: (1) claims that seek damages reflective of the loss of plaintiff's expectancy interest (i.e., claims that seek to give plaintiff the benefit of its bargain), and (2) claims that seek recovery in the nature of restitution (i.e., claims that seek to force defendants to disgorge any benefits realized as a result of plaintiff's non-gratuitous efforts). As the following discussion demonstrates, however, District of Columbia law precludes plaintiff from obtaining either form of relief under any set of facts that could be proved consistent with the allegations made by plaintiff.[FN12] Hence, the Court will grant defendants' motions to dismiss the contract and quasi-contract claims for failure to state a claim upon which relief may be granted.

### A. Claims for Expectancy Interest

[1][2] Plaintiff asserts that defendants, "[b]y failing to make payment to plaintiff" when requested, breached either an express or an implied-in-fact contractual promise to do so. *See id.* at ¶¶ 38-39, 41.[FN13] To plead breach of contract a plaintiff must allege, "an unjustified failure to perform all or any part of what is promised in a contract entitling the injured party to damages." *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C.1970) (internal citations omitted). As far as the Court can decipher from the complaint-which is hardly a model of precision-the claims asserted against HII, Bill Harbert, and BHIC for breach of an express contractual agreement, *see id.* at ¶¶ 38-39, are based upon the promise contained in the contingency-fee agreement to pay King & King a percentage of any recovery on the claim, whereas the "implied-in-fact contract" claim asserted against Bill Harbert and BIE, *see id.* at ¶ 41, arises out of the June 18, 2002, letter in which Bill Harbert promised to honor the commitments he had made on behalf of HII to pay for plaintiff's legal services, *see id.* at ¶ 34.[FN14] The distinction, however, is largely immaterial for present purposes because the terms of the promises, as alleged, are identical.[FN15] Plaintiff contends that, as damages for breach of these promises, defendants "should be required to compensate plaintiff pursuant to the fee agreement." *See id.* at ¶¶ 38-39, 41. In other words, plaintiff seeks to recover that to which it would have been entitled had the Kwajalein appeals gone forward and the appellant (be it HII or some other party) recovered the full amount sought.

*5 [3] The fatal deficiency in all these claims is that, although plaintiff acknowledges that payment under the contract (beyond the $150-per-hour fee, which concededly was paid) was contingent upon there being some recovery for the Kwajalein claims, plaintiff fails to allege that there was any such recovery. In other words, plaintiff does not allege "an unjustified failure [by defendants] to perform all or any part of what is promised," *Fowler*, 262 A.2d at 347, because plaintiff does not assert that defendants ever promised to pay King & King under these circumstances. This is hardly surprising, as it is axiomatic that a client's recovery is a condition precedent to the obligation to pay an attorney under a contingency-fee agreement. *See Black's Law Dictionary* 315 (7th ed.1999) (defining a contingency fee as "[a] fee charged for a lawyer's services only if the lawsuit is successful or is favorably settled out of court"); *see also Falcone v. Hall*, 235 F.2d 860, 862 (D.C.Cir.1956) ("An attorney retained in a true contingency fee basis has 'an interest in the cause of action.' This interest is treated for purposes of recognition as an equitable or contract lien.... If the attorney has an interest in the cause of action, he has *an interest in the judgment* into which the cause of

action merges.") (emphasis supplied); *Martens v. Hadley Mem'l Hosp.*, 753 F.Supp. 371, 372 (D.D.C.1990) ("D.C. case law has long recognized the validity of an attorneys' charging lien *in proceeds obtained through judgment and recovery* where the client and the attorney understood that the attorney would be paid out of the case's proceeds.") (emphasis supplied); *Robinson v. Nussbaum*, 11 F.Supp.2d 1, 5 (D.D.C.1997) ( "The modern rule is that the special nature of the attorney-client relationship prevents an attorney from asserting an enforceable interest in future fees until the occurrence of the contingency.").

[4] Plaintiff unsuccessfully attempts to overcome this fundamental deficiency by resort to the "prevention doctrine," *see* Pl.'s Opp'n to Mots. to Dismiss at 11, which operates as "an exception to the general rule that [a party] has no duty to perform under a contract containing a condition precedent until the condition occurs." *District-Realty Title Ins. Corp. v. Ensmann*, 767 F.2d 1018, 1023 (D.C.Cir.1985). The doctrine "excuses a condition precedent when a party wrongfully prevents the condition from occurring." *Id.* The D.C. Circuit has observed that "[t]he prevention issue most frequently arises in cases involving real estate brokers" where the broker seeks to recover a commission that was contingent upon a completed sale by claiming that the property owner refused to pursue a contract with a bona fide purchaser and thereby wrongfully prevented the sale. *Shear v. Nat'l Rifle Ass'n of Am.*, 606 F.2d 1251, 1255 n. 19 (D.C.Cir.1979). As the court of appeals explained in *Shear*, however, "the prevention doctrine does not apply when the contract, in effect, authorizes prevention." *Id.* at 1256. So, for example, in a case where a broker "assumed the risk that the seller would frustrate the sale," then the broker "had no right to complain about prevention when that risk materialized." *Id.* (citing *Dixon v. Bernstein*, 182 F.2d 104 (D.C.Cir.1950), as illustrative); *see also Ensmann*, 767 F.2d at 1023-24 ("The essential inquiry is whether or not the contract allocated the risk of [the non-occurrence of the condition]."); Restatement (Second) of Contracts § 245 cmt. a (1981) ("There is no breach if the risk of such a lack of cooperation was assumed by the other party or if the lack of cooperation is justifiable."). Thus, if the contract explicitly or implicitly permits the promisor to take some action, and that action, in turn, prevents or hinders the occurrence of some condition precedent to the promisor's performance obligation, then the failure to meet that obligation will *not* constitute breach.

*6 [5][6] Here, then, the prevention doctrine is inapplicable if the contract expressly or implicitly permitted defendants to forfeit the claims (i.e., allowed defendants to prevent or hinder the occurrence of the condition precedent to the duty to pay). It is a well-established principle of attorney-client relations that the client controls his claim and, therefore, is entitled to discontinue pursuit of a claim without penalty. See D.C. R. Prof'l Conduct 1.2(a) ("A lawyer shall abide by a client's decisions concerning the objectives of representation ... [and] shall abide by a client's decision whether to accept an offer of settlement of a matter."). Hence, implicit in every contractual arrangement between a lawyer and his client is a term permitting the client to discharge the attorney for any reason and at any time. *Nussbaum*, 11 F.Supp.2d at 5. At the root of this principle is the belief that trust and confidence are essential elements of any attorney-client relationship, and therefore that a client should not be forced to continue to employ an attorney with whom he no longer retains this rapport, regardless of whether he has agreed to pay the attorney at an hourly rate or on a contingent-fee basis. *See id.* at 5 (citing *Fracasse v. Brent*, 6 Cal.3d 784, 100 Cal.Rptr. 385, 494 P.2d 9, 13 (1972)).[FN16] Furthermore, the very purpose of contingency-fee agreements for legal services is to allocate the risk of non-occurrence of recovery to the attorney rather than the client. In light of the principle of unfettered client discretion over the objectives of legal representation as well as the allocation of risk reflected in the contingency-fee agreement, the decision by a client to discontinue or forfeit his claim cannot be deemed a hindrance to the occurrence of a condition precedent, nor can it give rise to a claim of breach.[FN17]

Plaintiff's conclusory assertion that it "substantially performed its obligations," *see* 2d Am. Compl. ¶ 34, likewise fails to cure the deficiency in plaintiff's claim for contractual damages. It is true, as plaintiff points out, that "District of Columbia law permits a lawyer discharged by a client prior to full performance, to collect a contingent fee in full if the lawyer has substantially performed." *See* Pl.'s Opp'n to Mots. to Dismiss at 12; *see also Kaushiva v. Hutter*, 454 A.2d 1373, 1374 (D.C.1983) (holding that "an attorney who enters into a contingency fee agreement with his client, substantially performs, and is then prevented by his client from completing performance is entitled to the full amount specified in the fee agreement"). But the cases that hold as much are subject to a significant limiting principle: The client must obtain some recovery as a result of the attorney's substantial performance. *See Kaushiva*, 454

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----  
--- F.Supp.2d ----, 2006 WL 1731141 (D.D.C.)  
(Cite as: --- F.Supp.2d ----)

Page 7

A.2d at 1375 (observing that the result in the case was "consistent with cases in other jurisdictions holding that where an attorney is discharged without cause *and the client subsequently recovers,* the attorney is entitled to the full amount of his fee") (emphasis supplied); *In re Waller,* 524 A.2d 748, 750 (D.C.1987) ("[O]ur use of the term 'substantial performance' in *Kaushiva* in the context of contingency fee agreements between attorney and client, meant that the attorney must have performed valuable services *contributing to the results finally obtained by the client.*") (emphasis supplied).

*7 The Court is aware of no cases-in the District of Columbia or elsewhere-in which a client has been held obligated to pay his attorney a contingency fee in the absence of the occurrence of the condition precedent (i.e., recovery of some value on the underlying claim). Such a limitation on contractual damages is unavoidable, of course, because substantial performance is merely a substitute for full performance, not a substitute for the occurrence of the condition. Thus, the claim of substantial performance is merely a distraction. Even assuming, as the Court must, that plaintiff substantially performed, the recovery remains zero, and-according to the formula in the parties' agreement-when the recovery is zero, the contingency fee also is zero. Hence, failure to pay the contingency fee would not constitute breach.

By rejecting plaintiff's contract claims because of the failure to plead the existence of a recovery by the client, the Court does not mean to suggest that success on the underlying claim requires recovery of a monetary sum. To the contrary, as the Court indicated at the motions hearing, any tangible, identifiable recovery might suffice to give rise to the client's duty to pay the contingency fee. Although plaintiff speculated at the hearing that defendants may have agreed to forfeit their claims as part of a bargain with the Justice Department during the criminal investigation, plaintiff has neither made that allegation in the complaint nor proposed amending the complaint to add such an allegation-presumably because plaintiff could not do so consistent with the requirements of Rule 11(b)(3) of the Federal Rules of Civil Procedure. The Court, of course, is therefore precluded from considering this speculative possibility for purposes of resolving the present motions to dismiss.

### B. Claims for Restitution

[7][8] Perhaps recognizing the flaw in its claims for expectancy damages under the contract, plaintiff advances an alternative legal theory sounding in restitution or quasi contract.[FN18] *See* 2d Am. Compl. ¶ ¶ 40, 44. A quasi contract "is not a contract at all, but a duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment." *Bloomgarden,* 479 F.2d at 208.[FN19] "[I]f there is no basis for unjust enrichment, there is no basis for restitution.... The purpose of restitution is to require a person who has been unjustly enriched at another's expense to compensate the other party for the amount of enrichment, restoring the other to the position he formerly occupied either by the return of something [that the other party] formerly had or by the [transfer] of its equivalent in money." 42 C.J.S. *Implied Contracts* § 6 (2005). Here, plaintiff seeks restitution in the form of the "reasonable value of the services it rendered on behalf of defendants during the period February 1995 through January 2003." 2d Am. Compl. ¶ 44. Courts often refer to this type of restitutionary interest by the Latin phrase *"quantum meruit,"* which loosely translates to "as much as he deserves." *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 175 (2d Cir.2005) (stating that, under New York law, courts "may analyze *quantum meruit* and unjust enrichment together as a single quasi contract claim" because "unjust enrichment is a required element for an implied-in-law, or quasi contract, and *quantum meruit,* meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract").[FN20]

*8 [9] Defendants maintain that, under District of Columbia law, a claim for *quantum meruit* is not sustainable where there is an express written agreement between the parties regarding the same subject matter. *See* HII Defs.' Suppl. Mem. in Supp. of Mot. to Dismiss at 4-5 (citing *Dale Denton Real Estate, Inc. v. Fitzgerald,* 635 A.2d 925, 928 (D.C.1993)); *see also Standley v. Egbert,* 267 A.2d 365, 368 (D.C.1970) ("[Q]uantum meruit[ ] is not applicable when compensation of the parties is covered by an express written contract."); *Leba v. Sills,* 175 A.2d 599, 600 (D.C.1961) ("[I]t has consistently been held that a plaintiff cannot claim or recover on a *quantum meruit* theory when the rights of the parties and the basis of compensation are covered by special contract."). As a general matter, this is true, but defendants gloss over the fact that District of Columbia courts have expressly permitted *quantum meruit* claims in situations where an attorney was employed under a contingency-fee contract and was discharged by the client without

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause before he was able to complete performance or substantially perform. See Kaushiva, 454 A.2d at 1374; see also Greenberg, 567 A.2d at 885-86. Assuming that the plaintiff's factual allegations are true, as the Court must, that is precisely the situation presented here. Be that as it may, however, plaintiff's claim for *quantum meruit* fails on its face for a different reason. Indeed, it fails for essentially the same reason that the contractual claims fail-that is, because plaintiff has not adequately alleged that defendants obtained any identifiable, tangible benefit as a result of plaintiff's legal services.

Those cases that recognize a *quantum meruit* claim for a wrongfully discharged attorney who had been retained under a contingency-fee agreement presuppose that the client recovered something on his claim or otherwise tangibly benefitted from the discharged lawyer's work.[FN21] As plaintiff candidly acknowledges, there is no reported case applying D.C. law in which an attorney successfully obtained relief on a *quantum meruit* theory when the client had recovered nothing on the claim. See Pl.'s Suppl. Mem. in Opp'n to Mots. to Dismiss at 3.[FN22] Nor is the Court aware of any case, in any jurisdiction, that has recognized a cause of action (on a *quantum meruit* theory or otherwise) for a discharged attorney where the client forfeited the claim at the time of discharge.[FN23] A requirement that the lawyer-plaintiff allege some benefit by the client-defendant is fully consonant with the public-policy considerations that give rise to a client's privilege to terminate the attorney-client relationship for any reason without penalty. See D.C. R. Prof'l Conduct 1.2(a); Nussbaum, 11 F.Supp.2d at 5.

More significantly, this requirement is consistent with the doctrinal underpinnings of *quantum meruit* because, as noted above, *quantum meruit* is, at its core, concerned with preventing one party from being unjustifiably *enriched* at the expense of another. See Novecon Ltd. v. Bulgarian-Am. Enter. Fund, 190 F.3d 556, 565 (D.C.Cir.1999) ("To prevail on [a *quantum meruit*] claim, a party 'must show that the services [it performed] were beneficial to the recipient.' ") (quoting Fred Ezra Co. v. Pedas, 682 A.2d 173, 176 (D.C.1996)); New Economy Capital, LLC, v. New Markets Capital Group, 881 A.2d 1087, 1095 (D.C.2005) ("[On] a quantum meruit theory of recovery, [plaintiff] is required to demonstrate the following: (1) *valuable* services ... rendered [by the plaintiff]; (2) for the person sought to be charged ...; (3) which services were accepted by the person sought to be charged, and *enjoyed by him or her;* and (4) under such circumstances as reasonably notified the person sought to be charged that [the plaintiff], in performing such services, expected to be paid.") (emphasis supplied). A complaint that fails to allege any benefit to defendants-as this complaint does-is inconsistent with the necessary showing of unjust enrichment.[FN24] Merely alleging that plaintiff provided defendants with legal representation in litigation, without an accompanying (and non-conclusory) assertion that defendants actually benefitted therefrom, will not suffice to state a claim for which *quantum meruit* relief may be granted.

*9 There may be some circumstances in which a client forfeits a claim but nonetheless is able to realize some benefit from the services its lawyers provided on a contingency-fee basis-particularly where the client is a repeat participant in similar litigation (so that, for example, the client can make use of the same legal arguments in future cases)-and those circumstances may give rise to a cognizable claim for *quantum meruit*. But there is no such allegation here. Plaintiff has no doubt suffered a loss, in the form of opportunities forgone, as a result of its professional engagement with defendants. That alone, however, does not entitle plaintiff to a restitutionary recovery such as *quantum meruit*.[FN25] Claims for *quantum meruit* relief cannot be sustained in the absence of enrichment on the part of defendants. Plaintiff's quasi-contract claims therefore must be dismissed because plaintiff has failed to plead an essential element of the claim.

## II. Tortious Interference Claim

[10] Plaintiff also alleges that the HII defendants tortiously interfered with plaintiff's contractual relationship with Bill Harbert and HIE (assuming, as the complaint does in the alternative, that the contractual relationship was actually with one or both of those parties rather than with HII). See 2d Am. Compl. ¶ 42.[FN26] This claim can be disposed of summarily because plaintiff fails adequately to allege a necessary element of the cause of action. "To recover in tort for intentional interference with contractual relations, the plaintiff must prove four elements: (1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach." Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc., 565 A.2d 285, 289 (D.C.1989) (internal quotations omitted). In this case, plaintiff is unable to allege that any contract was breached, for the reasons explained above in the discussion of plaintiff's contractual claims. Hence,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff cannot possibly maintain a claim for tortious interference with contractual relations.

## CONCLUSION

For the foregoing reasons, and upon consideration of the entire record, the Court will dismiss plaintiff's complaint for failure to state a claim upon which relief may be granted. A separate order has been issued herewith.

## *ORDER*

Upon consideration of [12] & [13] defendants' motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the parties' memoranda in support and in opposition thereto, and the entire record, and for the reasons stated in the memorandum opinion issued on this date, it is this *26th* day of *June,* 2006, hereby

**ORDERED** that the motions are **GRANTED**; it is further

**ORDERED** that plaintiff's Second Amended Complaint is **DISMISSED** for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that [27] defendants' motion to strike portions of the Second Amended Complaint is **DENIED** as moot.

> FN1. Although parts of the complaint suggest that defendants deceived plaintiff or otherwise misrepresented pertinent facts, *see* 2d Am. Compl. ¶ ¶ 20, 34, there is no discernable claim of fraud-which, of course, must be pleaded with particularity. *See* Fed.R.Civ.P. 9(b).

> FN2. From 1975 to 1993, BIE was known as Harbert International Establishment or "HIE." 2d Am. Compl. ¶ 3.

> FN3. Plaintiff describes the history of its relationship with the defendants as dating back to 1979. 2d Am. Compl. ¶ 8. "Thereafter on a regular and continuing basis, throughout the 1980's and into the 1990's, plaintiff provided legal services with respect to various construction contracts awarded to HII by agencies of the United States Government, or funded by such agencies[.]" *Id.* at ¶ 9. These contracts included construction work on the Rod el Farag water treatment plant in Cairo, Egypt; the U.S. embassies in Bahrain, South Africa, and the former Yugoslavia; a waste-water treatment plant in Puerto Rico; and a coal-loading facility in Punta Arenas, Chile. *Id.*

> FN4. In September of 1981, the board of directors of HII authorized HII officers, including Bill Harbert, to assign any of HII's international construction contracts to the company that was then called Harbert International Establishment (now BIE). *Id.* at ¶ 19. "[E]ssentially performance of all overseas construction contracts awarded to [HII] ... were assigned to HIE." *Id.* at ¶ 19. King & King contends that it was unaware of this assignment until the issue was raised by the government in 1997. *Id.* at ¶ 20. Upon review, however, King & King concluded that HII would prevail on the issue of illegal assignment because HII had evidence indicating that the government's contracting officer had approved the assignment of the Kwajalein contracts on the condition that HII remain financially obligated to the government under the contracts. *Id.*

> FN5. The parties agree that a three-year statute of limitations applies to all the claims in this suit. Defendants have raised a defense that this suit is time-barred, arguing that plaintiff's causes of action accrued sometime before January 20, 2003, rather than on January 26, 2003 (the date the appeals were dismissed with prejudice), or later, as plaintiff has asserted. The statute of limitations in this case implicates disputed issues of material fact and thus is not capable of resolution at this preliminary stage of the litigation. *See Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C.Cir.1996) ("[B]ecause statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred.").

> FN6. Specifically, King & King would receive twenty percent of any recovery of $2 million or less, and if the recovery exceeded $2 million, King & King would receive

$400,000 (twenty percent of $2 million) plus twenty-five percent of all amounts recovered in excess of $2 million. *See* 2d Am. Compl. ¶ 34.

FN7. Plaintiff's counsel (who was primary counsel representing defendants in the underlying proceedings) stated that when, in 1997, "it became apparent to us ... that we weren't ever going to be able to settle this case[,] ... we went back to Bill [Harbert] and said we're willing to proceed on a largely contingent fee basis, but ... we need to have some small hourly portion that we get compensated for." Tr. of May 24, 2006, Mot. Hr'g at 49.

FN8. Because plaintiff did not append the agreement to the complaint, or even quote it, the record is devoid of further information about what else, if anything, was contained in the agreement; indeed, the Court merely has before it plaintiff's paraphrased description of the payment terms.

FN9. Notwithstanding the absence of specific evidence of the contract before the Court, defendants do not dispute that a contract existed or that it was memorialized in a signed writing.

FN10. Plaintiff alternatively requests an award of the "reasonable value of the services it rendered on behalf of defendants during the period February 1995 through January 2003." 2d Am. Compl. ¶ 44.

FN11. It is unclear from the record precisely who made these per-hour payments.

FN12. The parties agree that their relationships are governed by District of Columbia law.

FN13. Plaintiff made a demand upon Bill Harbert on April 11, 2003, for payment of $4,779,830.20, and made an identical demand upon HII on January 14, 2005. *See* 2d Am. Compl. ¶ 35, 36.

FN14. An implied in fact contract "is a true contract containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Bloomgarden v. Coyer,* 479 F.2d 201, 208 (D.C.Cir.1973).

FN15. According to the complaint, the implied-in-fact contract is derivative of the contingency-fee agreement and is in the nature of a suretyship agreement.

FN16. Whether a lawyer-client agreement may bind the client to pursue a claim to settlement or a court-ordered disposition (i.e., to promise not to forfeit the claim) and still comply with the lawyer's ethical obligations is a question the Court need not address because plaintiff has not alleged that defendants agreed to pursue the claims unconditionally.

FN17. Even putting aside the issues of justification or assumption of risk, there is another possible obstacle to application of the prevention doctrine on the facts alleged here by plaintiff-the substantial uncertainty that the condition precedent (recovery on the underlying Kwajalein claims) would have occurred in any event (i.e., had the claims not been forfeited). *See* Restatement (Second) of Contracts § 245 cmt. b (1981) ("[I]f it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure [to cooperate] did not contribute materially to its non-occurrence and the rule does not apply.").

FN18. " 'Restitution' has been termed a modern designation for the older doctrine of quasi contract, imposing quasi-contractual liability for unjust enrichment upon a person receiving a benefit which it is unjust for him to retain." 42 C.J.S. *Implied Contracts* § 6 (2005). *See also* Restatement of Restitution, General Scope Note (1937) (stating that the doctrine of restitution addresses those "situations in which one person is accountable to another on the ground that otherwise he would unjustly benefit or the other would unjustly suffer loss" and noting that this "includes the rules usually classified under the heading of quasi contracts").

FN19. For this reason, quasi contracts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sometimes are referred to as "implied-in-law contracts."

FN20. District of Columbia cases use the term *quantum meruit* in the context of claims based on contractual relationships as well as claims based on non-contractual (i.e., quasi-contractual) relationships. See *Perles v. Kagy*, 362 F.Supp.2d 195, 201 (D.D.C.2005) (observing that "[t]he confusion[ ] surrounding the term '*quantum meruit* ' is by no means unique to the District of Columbia [c]ourts"). *Perles* identifies three distinct ways in which D.C. courts treat *quantum meruit*. One line of cases equates *quantum meruit* with implied-in-fact contract; another line of cases equates it with quasi contract; and a third line of cases treats a request for *quantum meruit* relief not as a separate legal theory of recovery, but rather as a measure of damages, "without reference to whether the Court found the relationship to be an implied-in-fact contract or a quasi-contract." *Id.* at 200-01; cf. *Maksym v. Loesch*, 937 F.2d 1237, 1247 (7th Cir.1991) (Posner, J.) (applying Illinois law) ("[T]he principle of quantum meruit, as applied to suits by lawyers on valid contracts, supplies not the cause of action-the contract supplies that-but rather a ceiling on contractual recovery. If the lawyer has a fee contract[,] the suit is on the contract, even though the court may decide not to award the full contractually specified fee because the lawyer had not, prior to being discharged, rendered services commensurate with it."). For present purposes, the Court believes that it is consistent with D.C. law to use the term *quantum meruit* as shorthand for the quasi-contractual remedy that plaintiff requests as an alternative to an award of his purported expectancy interest under the contract.

FN21. By "wrongfully discharged," the Court means "without cause," not without right. As noted above, the law permits a client to discharge his attorney for any reason at all. The availability of *quantum meruit* simply reflects the principle that the client (or his replacement counsel) should not be permitted to *profit* from the discharge.

FN22. The Court is not persuaded by plaintiff's reliance on cases from New York, Maryland, and elsewhere which hold that a discharged attorney's cause of action for *quantum meruit* accrues immediately upon termination without cause, rather than upon recovery on the underlying claim. See, e.g., *Martin v. Camp*, 219 N.Y. 170, 114 N.E. 46, 49 (1916); *Skeens v. Miller*, 331 Md. 331, 628 A.2d 185, 189 (1993); *In re Estate of Callahan*, 144 Ill.2d 32, 161 Ill.Dec. 339, 578 N.E.2d 985, 987-89 (1991). Even assuming that this were the rule in the District of Columbia-the D.C. Court of Appeals has not had occasion to rule on the accrual issue, and where there is an absence of District of Columbia law, courts must look to the common law of Maryland, see *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1171 (D.C.Cir.2003)-it is not dispositive of the issue before the Court because a rule governing *accrual* of a cause of action does not necessarily allow *quantum meruit* relief in a case where, as here, recovery is definitively barred for the client. Indeed, in all the cases that apply the immediate-accrual rule, there remained at least a *possibility* of recovery (and an intention to attempt recovery) by the client, and therefore a potential for the client to realize some tangible benefit from the discharged lawyer's services. That is not the case here. Moreover, courts applying New York law have rejected claims for *quantum meruit* where "a client who retained an attorney under a contingent-fee agreement discharges the attorney because there is no chance of recovery for the client." *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 265 n. 7 (2d Cir.2004) (citing *Crowley v. Wolf*, 281 N.Y. 59, 22 N.E.2d 234, 237 (1939)). In that situation, New York courts consider the discharge to be "for cause." *Id.*

FN23. Only one published decision that the Court is aware of even comes close to articulating a rule favorable to plaintiff. In that case, the Second Circuit, applying New York law, held that "the clients' lack of a monetary recovery in the underlying litigation" did not necessarily preclude an award of compensation to a law firm that was discharged without cause. See *Universal Acupuncture*, 370 F.3d at 264. Without expressing any opinion on whether that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----  
--- F.Supp.2d ----, 2006 WL 1731141 (D.D.C.)  
(Cite as: --- F.Supp.2d ----)

Page 12

reflects a proper reading of New York law, or whether that view of the law is consistent with District of Columbia law, this Court observes that the facts in *Universal Acupuncture* are materially distinguishable from those present here. In *Universal Acupuncture,* the client discharged the firm and proceeded to pursue the claim with new counsel, who ultimately failed to obtain a recovery. The facts of that case are certainly consistent with an allegation of benefit to the client, as the new counsel might well have made use of work that was done by the discharged law firm.

FN24. Plaintiff does assert that "Bill Harbert and/or BIE [were] unjustly enriched by [plaintiff's] efforts," but that is a conclusory legal assertion that the Court need not accept as true in resolving a motion to dismiss. *See Papasan,* 478 U.S. at 286, 106 S.Ct. 2932.

FN25. Plaintiff's assertion that it suffered a detriment-although irrelevant to a *quantum meruit* claim-is substantially mitigated by the hybrid nature of this contingency-fee agreement (whereby, for all but two years of the relevant time period, plaintiff received a "reduced" hourly rate for its services, for a total of nearly $150,000).

FN26. If the contract were with HII, there could be no tortious interference claim because a party cannot tortiously interfere with its own contract. Nor could Raymond Harbert, as president of HII, tortiously interfere with HII's contract because "a corporate officer is an implied party to the contract and, therefore, does not have the third-party status necessary to be liable for tortious interference with contract." *Weaver v. Gross,* 605 F.Supp. 210, 216 (D.D.C.1985).

D.D.C.,2006.  
King & King, Chartered v. Harbert Intern., Inc.  
--- F.Supp.2d ----, 2006 WL 1731141 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1343851 (Trial Motion, Memorandum and Affidavit) Reply of Defendants Bilhar International Establishment, Bill Harbert International Construction, Inc., and Bill L. Harbert to Plaintiff's Opposition to Defendants' Motion to Dismiss First Amended Complaint (Apr. 20, 2006) Original Image of this Document (PDF)

• 2006 WL 1343848 (Trial Motion, Memorandum and Affidavit) Reply of Defendants Harbert International Incorporated and Raymond Harbert in Support of Motion to Dismiss (Apr. 18, 2006) Original Image of this Document (PDF)

• 2006 WL 1343846 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response and Memorandum of Law in Opposition to Defendant'S' Motions to Dismiss (Apr. 5, 2006) Original Image of this Document (PDF)

• 2006 WL 1046760 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss First Amended Complaint and Memorandum of Law of Defendants Harbert International Incorporated and Raymond Harbert (Mar. 27, 2006) Original Image of this Document (PDF)

• 2006 WL 1046761 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss First Amended Complaint and Memorandum of Law of Defendants Bilhar International Establishment, Bill Harbert International Construction, Inc., and Bill L. Harbert (Mar. 27, 2006) Original Image of this Document (PDF)

• 2006 WL 1046758 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response and Memorandum of Law in Opposition to Defendants' Motions to Dismiss (Mar. 12, 2006) Original Image of this Document (PDF)

• 2006 WL 1046759 (Trial Pleading) First Amended Complaint (Mar. 12, 2006) Original Image of this Document (PDF)

• 2006 WL 1046756 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss and Memorandum of Law of Defendants Harbert International Incorporated and Raymond Harbert (Mar. 2, 2006) Original Image of this Document (PDF)

• 2006 WL 1046757 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss and Memorandum of Law of Defendants Bilhar International Establishment, Bill Harbert International Construction, Inc., and Bill L. Harbert (Mar. 2, 2006) Original Image of this Document (PDF)

• 1:06cv00324 (Docket) (Feb. 23, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.